THE PEOPLE OF PUERTO RICO, Plaintiff and Appellee, v. MIGUEL SANTIAGO NÚÑEZ, Defendant and Appellant.

No. 16289. Submitted May 5, 1958.—Decided May 19, 1958.

*Santiago Polanco Abréu* for appellant. *J. B. Fernández Badillo, Attorney General, Arturo Estrella, Assistant Attorney General, Alfredo Archilla Guenard* and *William Fred Santiago, Fiscal* and *Assistant Fiscal of the Supreme Court,* respectively, for appellee.

MR. JUSTICE SALDAÑA delivered the opinion of the Court.

Miguel Santiago Núñez was charged in the Superior Court, Aguadilla Part, with violating § 8 of the Weapons Act (25 L.P.R.A. § 418). He was also charged with the crime of robbery (§ 238 of the Penal Code, 1937 ed., 33 L.P.R.A. § 851). Having waived his right to a trial by jury in both cases, he was tried for both offenses jointly by the court without a jury on the same evidence, as stipulated by the parties. He was acquitted in the case of robbery but was found guilty of carrying weapons, and was thereafter sentenced to serve an indeterminate sentence of one to two years in the penitentiary, at hard labor. In this petition he alleges the following errors: (1) "The lower court committed gross and manifest error in weighing as a whole the evidence heard and the evidence offered"; (2) "The lower court committed gross and manifest error of law in finding the defendant NOT GUILTY in criminal case G–56–25 (Robbery), and GUILTY in the present case"; and (3) "The lower court committed gross and manifest error in convicting the defendant of a crime which is not supported by the evidence offered nor by the evidence heard."

The appellant discusses jointly the three errors assigned because they have a common basis, to wit: that the evidence for the prosecution is not clear and convincing as required in such cases where the weapon is not presented in evidence because it was not seized. See: *People v. Oquendo*, 79 P.R.R. 511, 515 (1956); *People v. Pacheco*, 78 P.R.R. 23, 28 (1955); *People v. Garcés*, 78 P.R.R. 95, 100 (1955); *People v. Rupizá*, 72 P.R.R. 694, 696 (1951); *People v. Guzmán*, 52 P.R.R. 444, 445 (1938); *People v. Cartagena*, 37 P.R.R. 261, 264 (1927). In fact, the only argument that the appellant offers in his brief, after citing several portions of the testimonies of the witnesses for the prosecution, is the following:

"It is to be noted that the weapon was not seized. When the weapon is not seized, its description must be clear so as

to dispel any doubt in the mind of the trier. When the weapon is not seized, the evidence for the prosecution must be clear and convincing. See *People* v. *Rupizá,* 72 P.R.R. 694. We admit that it is not necessary to seize the weapon and offer it in evidence. See *People* v. *Julián,* 18 P.R.R. 905; *People* v. *Blanco,* 68 P.R.R. 862; *People* v. *De Jesús,* 65 P.R.R. 877; and *People* v. *Nieves,* 35 P.R.R. 49. It has been held, however, that the weapon should have been duly identified. See *People* v. *Blanco,* 68 P.R.R. 862, and *People* v. *Blanco,* 77 P.R.R. 726.

"In this specific case the evidence reveals, as an identification or description of the weapon, that it was a rifle, 'I believe a .22 caliber' (Tr. Ev. 6). As a matter of intellectual honesty, we have to admit that the witnesses Rodríguez Alers testified that they heard shots and that as a consequence of those shots a rooster was killed. It is to be noted, however, that the learned judge of the trial court acquitted the defendant by giving him the benefit of the doubt. Otherwise stated, the judge was not satisfied but, on the contrary, he had doubts as to the guilt of the defendant in the robbery case, which is the principal crime with which the appellant was charged. If there was doubt as to the major crime, it seems to us that there should have been doubt as to the minor crime. We admit that the judge gave no explanation except for the comment of 'giving to the defendant the benefit of the doubt' (Tr. Ev. 33), in pronouncing sentence in the case of robbery, but, in our opinion, the mere expression of doubt is indicative of the dissatisfaction of the trial judge as to the sufficiency of the evidence or the credibility of the witnesses.

"Before closing this short brief, we wish to indicate that the main question in controversy is the determination of the sufficiency of the evidence, and particularly the degree of identification made of the weapon. We honestly confess that if this Honorable Court believes that the weapon was duly identified, the judgment should be affirmed. However, we wish to unburden our responsibility by submitting this case to the Court's consideration because we believe that the evidence offered by the prosecution is not sufficient at law to convict the defendant.

### PRAYER

"IN VIEW OF THE FOREGOING, we respectfully pray this Honorable Court to reverse the judgment rendered in this case by the lower court and to acquit the defendant."

We believe that the question thus raised is frivolous. In the first place, the evidence for the prosecution showed beyond doubt (1) that on the day of the occurrence the defendant was carrying a concealed weapon; (2) that that weapon was loaded; (3) that he fired four shots with it. Furthermore, that evidence supports clearly and convincingly the conclusion that the weapon was a .22 pellet rifle. Naturally, the fact that the trial judge acquitted the defendant of the crime of robbery by ". . . giving him the benefit of the doubt . . ." as to whether he stole the rooster which he killed with the rifle, has absolutely no bearing on his guilt in the case for carrying concealed weapons. Let us examine the pertinent portions of the testimonies of the witnesses for the prosecution, Ramón Rodríguez Alers and Pascual Rodríguez Alers, who stated:

*Ramón Rodríguez Alers:*
" .       .       .       .       .       .       .

Q.—Witness, do you know Miguel Santiago Núñez?
A.—Yes, sir.
Q.—Do you see him here in the court?
A.—Yes, sir.
Q.—Where is he?
A.—He is seated there.
Q.—The witness points to the defendant. Tell me, on December 30, 1955, about 1:00 p.m., where were you?
A.—That day I was weeding some bean plants.
Q.—Where?
A.—On my property, in my yard, on my land.
.       .       .       .       .       .       .       .

Q.—Tell me, while you were weeding those bean plants in your backyard, what happened there, if anything?
A.—It did happen.
Q.—What happened there? Explain to the judge what happened there.
A.—The trouble was that he crossed  . . . .
Q.—Who is he?
A.—Miguel.
Q.—This defendant?
A.—Yes, sir.

Q.—What did this gentleman do, if anything?

A.—He crossed over the wires.

Q.—Which wires?

A.—Of my parcel.

Q.—In what direction did he cross over them?

A.—In the direction he was coming; he was coming down from the beach in this direction and then he trespassed my property.

Q.—When you say 'he trespassed my property,' do you mean that he entered your property?

A.—Yes, sir.

Q.—And what did he do there, if anything?

A.—When he entered my property he took the rifle and pointed at the rooster.

Q.—He pointed at what?

A.—At the rooster.

Q.—What kind of rooster was it?

A.—The rooster was a yellow spotted bird weighing about 2-¼ pounds.

Q.—Whose rooster was it?

A.—My own, of Ramón Rodríguez Alers.

Q.—You mean yours?

A.—Yes, sir; he then said to me, 'I'm going to kill it,' and I said to him, 'don't kill it'; I said to him three times, 'don't kill it,' but he pulled the rifle just the same and killed it.

Q.—What did he say to you when you told him not to kill it?

A.—He said that he was going to kill the rooster and kill me.

Q.—Did he say why he wanted to kill the rooster?

A.—He did not say why he wanted to kill the rooster.

Q.—And despite the fact that you told him that the rooster was yours and not to kill it, he killed it just the same?

A.—Yes, sir.

Q.—At what distance were you from him when he spoke those words, that he was going to kill the rooster and kill you?

A.—He was at a distance of 30 to 40 feet from me.

Q.—What did he have in his hands when he said that to you?

A.—He had a rifle.

Q.—What kind of a rifle?

A.—I believe a .22 caliber rifle.

Q.—That is, a pellet rifle?

A.—Yes, sir.

Q.—Then, when he said to you that he was going to kill the rooster and kill you, what did he do, if anything?

A.—Well, he killed it; he killed the rooster.

Q.—Then, when he killed the rooster, did he fire the rifle?

A.—Yes, sir.

Q.—How many shots did he fire, do you know?

A.—Four shots, killing it with the last one; he did not fire a fifth shot.

.     .     .     .     .     .     .     ."

On cross-examination, he testified:

"Q.—Did you notice if Miguel had taken any rum?

A.—Well, he had not taken rum.

Q.—How do you know?

A.—Because this fellow, as I saw him there, I did not resist him because if I did he would have killed me, since he had entered my property and he had never done that . . . .

Q.—My question is whether he was intoxicated?

A.—He was intoxicated.

Q.—Did he use to tease you?

A.—Of course.

Q.—Did you kid each other?

A.—Yes, sir.

Q.—Did you kid and chat?

A.—Yes, sir.

Q.—Each other?

A.—Yes, sir.

Q.—Did you tease each other when you went on a spree?

A.—Yes, sir.

Q.—That was the truth?

A.—Yes, sir.

Q.—And that day he came up to you and said, 'I bet you I kill that rooster of yours'?

A.—Yes, sir.

Q.—He said it just like that?

A.—Yes, sir.

Q.—Just like that?

A.—Yes, sir.

Q.—And when he said to you, 'Ramón, I bet you I kill that rooster of yours,' he took out the rifle which you claim he was carrying and killed the rooster?

A.—Yes, sir.

. . . . . . . .

Q.—Then, when you said to him, 'don't kill my rooster,' he said to you, 'yes, I'm going to kill it,' again you said to him, 'don't kill it,' and then he said to you, 'yes, I'm going to kill it,' did he take out the rifle and fire at it?

A.—Yes, sir.

Q.—And did not hit it?

A.—No, sir, he did not hit it with the first shot.

Q.—And then he fired again?

A.—Yes, sir.

Q.—And killed it?

A.—Yes, sir.

Q.—Then, what did he do?

A.—After he killed the rooster, he slung his rifle and left.

. . . . . . . ."

*Pascual Rodríguez Alers:*

". . . . . . . .

Q.—Do you know Miguel Santiago Núñez?

A.—Yes, sir.

Q.—On December 30, 1955, between 12:00 and 1:00 p.m., where were you?

A.—I was at home.

Q.—At whose home?

A.—At my mother's.

Q.—Are you a relative of Ramón Rodríguez Alers?

A.—Brother.

Q.—Do you live in the same place?

A.—No, sir; I live apart.

Q.—Does Ramón live at the place where you were that day?

A.—Yes, sir.

Q.—Do you recall seeing this defendant that day in the house of Ramón Rodríguez Alers?

A.—Yes, sir.

Q.—At the stated hour?

A.—Yes, sir.

Q.—Please explain to the court what he did there, if anything?

A.—The day of the occurrence I was home and heard some shots, and I went out and saw Miguel shooting a rooster with a rifle.

Q.—What happened to the rooster?

A.—That he killed it."

The prosecution also presented in evidence four bullet caps of a .22 caliber rifle which were found on December 30, 1955, at the place of the occurrence by policeman Benito Vega, who appeared as a witness for the prosecution and duly identified them.

The district attorney submitted his case on that evidence and after a recess, without presenting any other evidence, the defense stated as follows: *"Your Honor, we wish to announce that we submit the case to Your Honor."* (Italics ours.)

For the evidence to be clear and convincing, it is not necessary that the testimony of the witnesses which merits the credit of the trial judge describe the weapon with the preciseness of a military or of a firearms expert. We so held in *People* v. *Guzmán*, 52 P.R.R. 444, 446 (1937). It is sufficient that the witnesses know what a rifle is, particularly if the defendant in the presence of the witnesses fires four shots with that weapon, as in the case at bar. In *People* v. *Rupizá*, 72 P.R.R. 694 (1951), the witnesses presented by The People testified conclusively that they saw the defendant carrying a revolver, but that they were unable to point out the difference between a revolver and a pistol, nor the color of its plates or its caliber. However, there we held that that fact " . . . did not mean that the unlawful carrying of the weapon had not been proved, . . ." applying the rule that the evidence for the prosecution must be clear and convincing. See, also, *People* v. *Garcés*, 78 P.R.R. 95, 101 (1955). On the other hand, there is no basis whatever in the record to disturb the weighing of the evidence for the prosecution made by the trial judge, particularly since the defense submitted the case without presenting evidence.

*People* v. *Aquino*, 79 P.R.R. 17 (1956) ; *People* v. *Piñeiro*, 77 P.R.R. 502 (1954) ; *People* v. *Comas*, 75 P.R.R. 388 (1953) ; *People* v. *Millán*, 71 P.R.R. 410 (1950).

We have deemed it advisable to write an elaborate opinion in this case for the same reasons which we set forth in the case of *People* v. *Rosario*, decided today. As long as the number of frivolous appeals in criminal and in civil cases continue to come increasingly to this Court, the problem of the congestion of the calendar in the Supreme Court is indeed unsolvable.

The judgment appealed from will be affirmed.

Mr. Justice Serrano Geyls did not participate herein.